**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| Tyson Beauchamp, Trevor Scott, ) | |
| and Signal Funding, LLC, ) | |
| ) | |
| PLAINTIFFS, ) | |
| ) | |
| v. ) | CASE NO. 16CH_____ |
| Oasis Legal Finance Operating ) | HONORABLE _____ |
| Company, LLC, ) | |
| ) | |
| DEFENDANT. ) | |
| _____) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND FOR DAMAGES

Plaintiffs Tyson Beauchamp and Trevor Scott ("Employee Plaintiffs" or "Beauchamp" or "Scott") bring this complaint to remedy violations of the Federal Labor Standards Act and Illinois Wage Payment Act and other employment related statutes and to make declaratory judgments concerning Plaintiffs' right to work for their new employer Signal Funding LLC ("Signal") and the scope of what they may or may not do during the course of such employment while a covenant not to compete, should it be found enforceable, remains in effect. Signal solely joins the declaratory judgment counts to seek clarity so that it cannot be accused of interfering with any covenants between Employee Plaintiffs and Defendant. In support of their claims, Plaintiffs states as follows:

## INTRODUCTORY STATEMENT

1.      Employee Plaintiffs file this lawsuit to protect their legal rights concerning payment of wages, commissions and bonuses granted to them under the Federal Fair Labor Standards Act (the "FLSA"), the Illinois Minimum Wage Act (the "IMWA"), and the Illinois

1

Wage Payment Collection Act (the "IWPCA") and to prevent their former employer Oasis Legal Finance Operating Company LLC ("Oasis OpCo") from interfering with Employee Plaintiffs' freedom to work for the employer of their choice, which in this case is the newly formed Signal Funding LLC. Signal joins the declaratory judgment portions of this complaint.

2. This lawsuit arises from Employee Plaintiffs' profound dissatisfaction with the work climate at Oasis OpCo, which involved the institution of a mandatory fifty-hour work week without the payment of overtime and significant changes in commission structure which was openly touted by senior management as designed to ensure that Employee Plaintiffs and their colleagues work more and make less.

3. Employee Plaintiffs found the conditions at Oasis OpCo increasingly untenable, and they found morale at a place at which they had previously enjoyed working had uniformly plummeted. Adding to their dissatisfaction were the imposition of retroactive commission "claw backs" and deductions for 'penalties' related to purported negligence. Plaintiffs not only regard these actions as unfair, but they also regarded the changes to be inconsistent with prevailing federal and state law concerning the payment of wages and overtime.

4. Employee Plaintiffs herein seek compensation for unpaid overtime, payment of commissions "clawed back," earned commissions and the repayment of "penalties" deducted from their commission statements. Employee Plaintiffs also seek an accounting to ensure all commissions earned have been paid and in particular to ensure that Oasis OpCo properly paid commissions pursuant to the "hunter" commission plan.

5. Employee Plaintiffs also seek declarations to clarify their right to work at Signal, where they began employment on October 11, 2016. Oasis OpCo has sent letters to each Employee Plaintiff threatening to take action to enforce covenants not to compete (see Exhibits 1

and 2 attached hereto), and Plaintiffs believe that the language of these clauses are overbroad in relation to the purported protectable interest and are not enforceable because they do not protect against the loss of near permanent relationships. The scope is also nationwide and therefore geographically overbroad and the non-competes have different durations – Beauchamp, who was a Senior Sales Director, has a one period specified in his covenant with less broad preclusive language than does the language in Scott's covenant even though Scott was a Sales Director and not a Senior. Further, Scott's covenant has a two year duration compared to Beauchamp's one year duration. If one year is sufficient to protect Oasis OpCo with regard to a Senior Sales Director, then it is clearly overbroad for a less senior Sales Director to be precluded for two years with a broader scope of preclusion.

6.     Signal joins the declaratory judgment action concerning the non-competes because it also needs guidance about what it can and cannot ask Employee Plaintiffs to do as employees of Signal. Signal has real doubts as to the enforceability of the clauses at issue, but Signal does not wish to be accused of interfering with the contractual relations between Employee Plaintiffs and Oasis OpCo, and by asking this Court to referee this issue less than one week after Employee Plaintiffs began their employment at Signal, Signal cannot be accused of interfering if it is following the guidance and direction of this Court.

## THE PARTIES

7.     Employee Plaintiff Tyson Beauchamp is a resident of Gilberts, Illinois and resides within this judicial district.

8.     Employee Plaintiff Trevor Scott is a resident of Gilberts, Illinois and resides within this judicial district.

9.     Plaintiff Signal Funding LLC is a Delaware LLC which maintains a place of business in Highland Park, Illinois which is located within this judicial district.

10.     Defendant Oasis Legal Finance Operating Company LLC is a Delaware LLC with its principal place of business located in Rosemont, Illinois, which is located within the boundaries of this judicial district.

## VENUE AND JURISDICTION

11.     Venue in this District is proper because all Plaintiffs and Defendants reside herein and the acts and events relevant to the litigation all occurred within this judicial district.

12.     This Court has jurisdiction of the Fair Labor Standards Act claim because it is a federal statute providing federal question jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction over the remainder of Employee Plaintiffs' state law claims under this Court's pendant jurisdiction authority under 28 U.S.C. §1367.

13.     This Court has jurisdiction over Signal and Signal's claims pursuant to the Supplemental Jurisdiction granted to it under 28 U.S.C. §1367.

14.     The employment agreements that Employee Plaintiffs signed with Oasis Opco both have provisions establishing the courts in Cook County, Illinois as the proper jurisdiction and venue for litigation related to the agreements.  (See Employment Agreements attached as Exhibits 3 and 4).

## FACTUAL BACKGROUND

## I.     EMPLOYMENT HISTORY AT OASIS OPCO.

15.     Employee Plaintiffs both were, until last week, Sales Directors at Oasis OpCo, which is one of the two or three largest companies offering plaintiffs in personal injury and worker's compensation lawsuits the opportunity to obtain funding or loans while their cases

4

proceed and before a judgment or a settlement. Oasis OpCo's business was limited to those two specific areas of plaintiff legal funding.

16.     When Beauchamp began working for Oasis OpCo in 2008 and Scott began working for Oasis OpCo in 2010, Gary Chodes ("Chodes") was the CEO of Oasis OpCo. Both Plaintiffs were always in a Case Manager/Sales Director roles at Oasis OpCo, which was primarily an inside-sales-oriented job where the vast majority of their income was paid on the basis of a commission schedule. Employee Plaintiffs during that timeframe had significant flexibility regarding the hours they worked.

17.     Employee Plaintiffs primarily answered inquiries from plaintiff customers and/or their attorneys seeking legal funding in specific states that came in through the internet or the call center. Each Employee Plaintiff was assigned primary responsibility for several states. Each Plaintiff also had a list of exclusive attorneys to whom they could sell, mostly drawn from the states within the Employee Plaintiffs' assigned territories, although the exclusivity designation aged off if Oasis OpCo did not do a funding with the attorney within six months of being designated as exclusive to the sales director.

II.     **CHANGES IN THE MANDATED WORK WEEK AND COMMISSION STRUCTURE AT OASIS OPCO AND THE PLUNGING EMPLOYEE MORALE.**

18.     In the middle of 2013, Chodes' employment at Oasis OpCo ended and Ralph Shayne became the CEO. Over time, Shayne instituted changes which destroyed employee morale and resulted in more work for less pay on the part of employees such as Employee Plaintiffs. Shaynes' personality also contributed to the morale problems.

19.     While the decline of Employee Plaintiffs' job satisfaction began in 2013 with the elevation of Shayne, their dissatisfaction became more pronounced within the last year as Shayne

5

instituted policies he openly described as requiring employees to "work more hours to make less money." Specifically, Shayne instituted mandatory hours requiring the entire operations department, which included Employee Plaintiffs, to be present in the office and working from 8:00 a.m. to 6:00 p.m. During this ten-hour work day, Employee Plaintiffs and their operations colleagues were discouraged from taking lunch breaks and were asked to eat at their desk and work through lunch. Employee Plaintiffs were not given an increase to their base salary despite the institution of a mandatory fifty-hour work week, nor were they paid overtime.

20.     In addition, Shayne made changes to the commission structure, reducing commissions and even instituting policies that would allow Oasis OpCo, in its discretion, to both "clawback" previously earned and paid commissions and even to deduct penalties from earned but not yet paid commissions.

21.     Employee Plaintiffs both suffered from clawbacks and penalties and the extended work week. In addition, Beauchamp in particular had been asking for an accounting of certain types of commissions to ensure he was being paid properly. Specifically, the "hunter" commission gave a larger commission on the third funding (and subsequent fundings beyond the third) with an attorney within one calendar year and the attainment of "hunter" status with a particular attorney was supposed to retroactively increase the commission on the first two fundings to the level of the commission on the third funding. While Employee Plaintiffs received a monthly commission report, they received no proof or substantiation that they were properly being credited with the correct "hunter" commission payments.

22.     Employee Plaintiffs had expressed their views concerning the fairness of the clawbacks and penalties and the work hours, but their views had fallen on deaf ears. Employee Plaintiffs were highly dissatisfied at Oasis OpCo, and morale at Oasis OpCo was abysmal. It had

6

become, in Employee Plaintiffs' views, a horrible place to work. Both Employee Plaintiffs, who are long-time close friends and even live in the same community, vowed to leave.

### III.   EMPLOYEE PLAINTIFFS JOIN SIGNAL.

23.    Employee Plaintiffs learned that Chodes, whose non-compete with Oasis OpCo had expired, had launched a new business called Signal Funding LLC, and they sought employment with Chodes, whom they both knew and liked from his prior time as CEO of Oasis OpCo.

24.    Signal is a start-up that is less than two months old, and it is intending to offer a variety of consumer funding services ranging from social security and disability advocacy services, commercial litigation funding, structured settlements, small business funding, and a full array of plaintiff litigation funding that will not be limited to just personal injury and worker's compensation plaintiffs.

25.    Before Employee Plaintiffs accepted offers and began working for Signal, Signal allowed Employee Plaintiffs to arrange for counsel to be paid for at Signal's expense.

26.    Employee Plaintiffs conferred with counsel, accepted their offers, and began working for Signal on October 11, 2016, less than one week prior to the filing of this complaint.

### IV.   OASIS OPCO THREAT LETTERS MAKE DECLARATIONS CONCERNING THE COVENANTS NOT TO COMPETE RIPE FOR ADJUDICATION UNDER THE DECLARATORY JUDGMENT ACT.

27.    Late in the day on October 11, 2016, each Employee Plaintiff received a letter from Oasis OpCo's counsel Littler LLC demanding that they cease working for Signal and to inform Littler of Employee Plaintiffs' compliance with this demand by the end of the day on October 14, 2016. (See Exhibits 1 and 2 attached hereto)

28.     Employee Plaintiffs' counsel responded to Littler on October 14, 2016 indicating that the Employee Plaintiffs regard the covenants not to compete referenced in the Littler letters to be unenforceable.

29.     Employee Plaintiffs filed this lawsuit the next business day to clarify their rights under the alleged covenants and to pursue their claims for unpaid wages and commissions.

30.     Signal joins the declaratory judgment claims concerning the covenants not to compete.

## V.     THE COVENANTS NOT TO COMPETE ARE OVERBROAD AND UNENFORCEABLE.

### A.  There is no Near-Permanent Relationship Protected by the Covenants Not to Compete.

31.     On or about September 9, 2013, Beauchamp was required by Oasis OpCo to sign an employment agreement that contained several post-employment restrictions.  Beauchamp's Agreement states in pertinent part: Employee agrees that  … for a period of one (1) year after the end of Employee's employment with the Company, for any reason whatsoever, Employee will not, within the United States of America, without prior written consent of the Company, directly or indirectly,  . . .  solicit, call upon, contact with, sell to, service, aid or assist any Company Customers, Referral Sources or Attorney Relationship with respect to only Company Products or Services, (See Exhibit 3, ¶ 5).

32.     On or about November 10, 2010, Scott was required by Oasis OpCo to sign an employment agreement that contained several post-employment restrictions. The postemployment restrictions in Scott's employment agreement are different from those contained in Beauchamp's Agreement.  Scott's Agreement states in pertinent part that Scott may not, "for a period of two years after [his] employment is terminated," . . . solicit, induce or provide or

attempt to solicit, or induce any product or services to any client or Prospective Client of the

Company which is competitive in any manner with the products or services which the Company

may provide to such clients, regardless of whether or not the Company has or is now selling such

product or services,…"  (See Exhibit 4, ¶ 4).

33.     Beauchamp's Agreement purports to restrict Beauchamp from, *inter alia,*

"soliciting Company Customers, Referral Sources or Attorney Relationships with respect to

only Company products and services."  . . . The term "Company Customers" is defined as "each

and every customer who has conducted business with the Company within the two year period

immediately preceding the date of Employee's termination . . . and about whom Employee had

gained Confidential Information or with whom Employee had personal contact during

Employee's employment  … and each and every entity which was prospective customer of the

Company and to whom Employee submitted or assisted in a proposal for services, or otherwise

solicited or assisted in the solicitation of the business of such entity, at any during the [2-year

period preceding termination] …"

34.     The term "Attorney Relationships" in Beauchamp's employment agreement is

defined as "(i) each and every attorney, paralegal, or attorney staff member with whom the

Company has done business, either directly or indirectly through the attorney's client(s), at any

time during the [two year period preceding termination] and about whom Employee had gained

Confidential Information … or with whom Employee during Employee's employment. had

personal contact during Employee's employment; (ii) each and every attorney, paralegal or

attorney staff member to whom Employee submitted or assisted in a proposal for services,

either to that attorney, paralegal or attorney staff member directly or to that Attorney's client, or

otherwise solicited or assisted in the solicitation of referrals from such entity at any time during [the two year period preceding termination.]" (See Exhibit 3, ¶ 5).

35.    Scott's Agreement purports to bar Scott from soliciting, inducing or providing or attempting to solicit "clients" and "prospective clients" of Oasis OpCo regarding "any products or services which the Company may provide to such clients." The term "Prospective Client" is defined as "any person, firm or entity which has been in contact with any employee or agent of the Company regarding the products and services of the Company during the [past] twelve – month period." (See Exhibit 4, ¶ 5).

36.    The post-employment restrictions in both Agreements are unenforceable because they are not reasonable and necessary to protect Oasis OpCo's legitimate business interests. Oasis does not, for example, have any near permanent relationships with its customers or the attorneys who refer those customers. The vast majority of Oasis OpCo's' customers are, for example, not repeat customers. They instead consist almost entirely of personal injury plaintiffs who have a potential or pending claim.

37.    Oasis OpCo also does not have long standing relationships with the attorneys who represent and refer customers and those relationships that have been developed with referring attorneys are not the result of any significant expenditure of time, money and effort.  The relationships are instead derived primarily from cold calls by the Company's Sales Directors or from responses to marketing. Most intakes come from Plaintiffs seeking funding and not from their attorneys. Plaintiffs in injury lawsuits are rarely going to have a near permanent relationship with a company like Oasis OpCo.

        **B.  Employee Plaintiffs Also Do Not Possess Confidential Information That is Not Otherwise Publically Available or Obtainable Through Reasonable Diligence Without having Worked at Oasis OpCo.**

38.     The post-employment restrictions are also unenforceable because Plaintiffs were not exposed to and are not utilizing anything that could even remotely be considered confidential information of Oasis OpCo. Pricing information, for example, is already commonly known by all of Oasis OpCo's competitors and is made available on-line and over the phone to anyone that inquires.

39.     Employee Plaintiffs are, moreover, not in possession of and do not have access to any current customer or attorney lists or any other documents that were developed by Oasis OpCo related to the Company's business.

40.     Even if Employee Plaintiffs did have continued access to Oasis OpCo's current customer and attorney lists, those lists do not constitute protectable confidential information because all of the contact information about the attorneys contained on the lists is publicly available from places such as the telephone directory, state and federal bar rolls, bar associations and other legal trade associations and journals.

41.     Employee Plaintiffs do not have continued access to Oasis OpCo's attorney rating system and have no need to access the system because Signal does not currently use an attorney rating system and has no intention of creating or using one.

42.     Further, the durational scope of the covenants is not remotely temporally related to the asserted protectable interest.  There are literally tens of thousands of attorneys rated in the Oasis system, and the ratings change literally daily based on pay back history.  Beyond the impossibility of Employee Plaintiffs remembering much if any of this rating information, it has already grown significantly stale even in the week since Employee Plaintiffs have left Oasis OpCo.

43.     Oasis OpCo also does not take any meaningful measures to maintain the confidentiality of its customer and attorney lists.  The lists are, for example, readily accessible to nearly everyone who works at the Company. The lists are also not marked as confidential, are not kept under lock and key or computer password protection and Oasis Opco employees are even permitted to email the lists and information from the lists to their personal e-mail accounts in order to facilitate working after hours.

### C. The Nationwide Scope of the Covenant not to Compete and The Conflicting Time Restrictions Are Broader than Necessary to Protect Oasis OpCo's Asserted Interests.

44.      The post-employment restrictions are also not enforceable because the restrictions are overbroad in their temporal and geographic limitations. For example, the temporal restriction in Beauchamp's contract is for 12 months from his last day worked while the temporal restriction in Scott's Agreement is 24 months from Scott's last day worked. Scott's restriction is twice as long as Beauchamp's even though Beauchamp occupied a more senior position at the time of Employee Plaintiffs' departure from Oasis OpCo.

45.     The geographic scope of the post-employment restrictions is also overbroad. The geographic scope in both agreements purports to be a nation-wide restriction. This is true even though the sales directors were primarily only assigned to work in specific regions of the country. Enforcement of the restrictive covenants as written would bar Employee Plaintiffs from contacting attorneys that they never did business with or even had contact with during the entire period of employment at Oasis OpCo.

46.     Enforcement of the restrictions would also be inequitable and cause an undue hardship on the Employee Plaintiffs as their departure was based on the intolerable work

12

conditions that were created at Oasis OpCo by Shayne and the Company's new management team.

47.     The intolerable work conditions that prompted Employee Plaintiffs' departure from Oasis OpCo included having their compensation reduced while at the same time being forced to work more hours, being required to frequently work 10-hour days and longer without a break, the arbitrary docking of pay even in situations where the employee was not at fault, an utter lack of empathy by management for employees with family obligations, discriminatory application of leave policies, among others.

> **D. Employee Plaintiffs' Compensation Did Not Comply With the Requirements Of The Fair Labor Standards, the Illinois Minimum Wage Act, The Illinois Wage Payment Collection Act and the Illinois One Day Rest in Seven Act.**

48.     Plaintiff Beauchamp began his employment at Oasis OpCo with the title of Sales Director.

49.     As a Sales Director, Beauchamp's job responsibilities included reviewing the information gathered by the Case Manager and making sales calls to attorneys in a specific region of the country assigned to the Sales Director or from attorney lists that are provided to the Sales Director. While he was a Sales Director, Beauchamp had two Case Managers reporting to him.

50.     Beauchamp's job title changed to Senior Sales Director on or about September 1, 2015. The change in title did not result in any significant increase in compensation or change to Beauchamp's job responsibilities.  Beauchamp was in the Senior Sales Director position when his employment at Oasis OpCo ended on or about October 5, 2016.

51.     Plaintiff Scott began his employment at Oasis OpCo with the title of Case Manager.  As a Case Manager, Scott's job responsibilities were to gather information regarding

13

a potential client's personal injury or worker's compensation claim by speaking to both the client and the client's attorney. In so doing, Case Managers follow a detailed checklist prepared by Oasis OpCo.

52.     On or about May 15, 2014, Scott was given the title of Sales Director.  As a Sales Director, Scott's job responsibilities were the same as Beauchamp's while Beauchamp was in the Sales Director position.  Scott was a Sales Director until his employment at Oasis OpCo ended on October 5, 2016.

53.     While they were in the Case Manager and Sales Director positions, Employee Plaintiffs' compensation had both salary and commission components.

54.     Oasis OpCo apparently considers the Case Manager and the Sales Director positions to be "exempt" from the overtime requirements of the Fair Labor Standards Act (the "FLSA") and the Illinois Minimum Wage Act ("IMWA"). As a result of this misclassification, the salary component of Plaintiffs ' compensation plans never varied regardless of whether Employee Plaintiffs worked 40 hours in a week or worked 60 hours in a week.

55.     Employee Plaintiffs worked a substantial amount of overtime while employed at Oasis OpCo. For example, the last quarter of the calendar year is the Company's busiest period.  During the last quarter of every calendar year, Employee Plaintiffs worked a minimum of 10 hours a day. This typical work schedule for the last quarter often continued into the first quarter of the following calendar year.

56.     During this busy period, from October to early January each year, Oasis OpCo did not permit Employee Plaintiff and other similarly situated employees to take meal breaks despite the fact that they were typically working 10 hour shifts and longer. Instead of allowing

Employee Plaintiffs to take their meal breaks, Oasis OpCo arranged for food to be delivered into the office so that Employee Plaintiffs and other similarly situated employees could work through the lunch period.

57.     As purported compensation for the long hours worked by Employee Plaintiffs and similarly situated employees, Oasis OpCo would occasionally pass out cash rewards or gas or other gift cards.

58.     Because Employee Plaintiffs were apparently classified as exempt from the overtime requirements of the FLSA and IMWA, Plaintiffs and similarly situated others did not receive any additional compensation for the hours that they worked over 40 in a work week, including for time spent working through their meal periods.

59.     Employee Plaintiffs also received commissions as a component of their compensation. Under the Company's commission policy, Case Managers are entitled to commissions according to a schedule.

60.     Within the last several years, the Company began to make unilateral deductions from Employee Plaintiffs' commission when the return on the funding did not meet the expected amounts or when the Company attributed "mistakes" to the Employee Plaintiff. The deductions for mistakes were actually three times the commission preciously paid and earned. Under the unilaterally implemented deduction policy, Case Managers' and Sales Directors' commission payment for commissions already earned were subject to deductions in an amount of up to three times the amount of the earned commission, depending on whether management felt the loss was preventable.

61.     Employee Plaintiffs did not freely consent to any of the deductions that were made from their compensation.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT CONCERNING
### ENFORCEABILITY OF COVENANTS NOT TO COMPETE
### AND THE ILLINOIS TRADE SECRETS ACT
### (Brought by All Plaintiffs)

62.     Paragraphs 1- 61 are repeated and re-alleged as if fully stated herein.

63.     There exists an actual and present controversy between Plaintiffs and Defendant as to the enforceability of the covenants contained in Plaintiffs' employment agreements.

64.     The Parties' actual controversy is ripe for adjudication and is properly before this Court pursuant to (28 U.S.C. §2201).

65.     A declaratory judgment would settle the controversy over the enforceability of the covenants.

WHEREFORE, Plaintiffs request that the Court declare the rights and other legal relations of the parties and rule as follows:

A.     Declare that the non-competition and non-solicitation clauses in Employee Plaintiffs' employment agreements are overbroad and unenforceable.

B.     Declare that Signal may employ Employee Plaintiffs without regard to the non-solicitation clauses in Employee Plaintiffs' employment agreements.

C.     Award such further relief as the Court deems appropriate.

### COUNT II -FLSA OVERTIME VIOLATIONS
### (Employee Plaintiffs)

66.     Paragraphs 1- 65 are repeated and re-alleged as if fully stated herein.

67.     Under the FLSA, Plaintiffs were entitled to be paid at the overtime rate by Defendants for each hour worked in excess of 40 hours each workweek.

68.    The overtime rate is computed by multiplying 1.5 times an employee's regular hourly rate, which includes all nondiscretionary compensation paid to employees.

69.    Defendant failed to compensate Plaintiffs at the overtime rate for work performed in excess of 40 hours per week in violation of the FLSA.

70.    Defendants' violation of the FLSA for failure to pay Plaintiffs overtime wages was willful and deliberate.

71.    Upon information and belief, Defendants' practice as described above was not approved in writing by the U.S. Department of Labor.

72.    Upon information and belief, Defendants' practices were not based upon Defendant's review of any policy or publication of the U.S. Department of Labor.

73.    Due to Defendants' violation of the FLSA, Plaintiffs are entitled to recover from Defendant their unpaid compensation, liquidated damages, punitive damages, reasonable attorneys' fees, and the cost of this action pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Plaintiffs pray for a judgment against Defendant as follows:

A.    Judgment in the amount of unpaid overtime wages for all time worked by Employee Plaintiffs in excess of forty (40) hours in individual work weeks;

B.    Liquidated damages in an amount equal to double the amount of unpaid overtime wages;

C.    punitive damages;

D.    That the Court declare that Defendants have violated the FLSA;

E.    That the Court enjoin Defendants from continuing to violate the FLSA;

F.    Reasonable attorneys' fees and costs of this action, as provided by the FLSA; and

G.    All further relief as this Court deems just and proper.

## COUNT III – ILLINOIS MINIMUM WAGE LAW OVERTIME VIOLATIONS
### (Employee Plaintiffs)

75.     Paragraphs 1- 74 are repeated and re-alleged as if fully stated herein.

76.     Under the IMWL, Plaintiffs were entitled to be paid at the overtime rate by Defendant for each hour worked in excess of 40 hours each workweek.

77.     The overtime rate is computed by multiplying 1.5 times an employee's regular hourly rate, which includes all nondiscretionary compensation paid to employees.

78.     Defendant failed to compensate Plaintiffs at the overtime rate for work performed in excess of 40 hours per week in violation of the IMWL.

79.     Defendant's violation of the IMWL for failure to pay Plaintiffs overtime wages was willful and deliberate.

80.     Due to Defendant's violation of the IMWL, Plaintiffs are entitled to recover from Defendants their unpaid compensation, liquidated damages, penalties, reasonable attorneys' fees, and the cost of this action pursuant to 820 ILCS 105/12 (a).

WHEREFORE, Plaintiffs pray for a judgment against Defendant as follows:

A.     Judgment in the amount of unpaid overtime wages for all time worked by Plaintiffs in excess of forty (40) hours in individual work weeks;

B.      Liquidated damages in an amount equal to the amount of unpaid overtime wages;

C.     Statutory damages and penalties pursuant to the formula set forth in 820 ILCS 105.12(a);

D.     That the Court declares that Defendant has violated the IMWL;

E.     That the Court enjoins Defendant from further violating the IMWL;

F.     Reasonable attorneys' fees and costs of this action, as provided by the IMWL; and

G.     All further relief as this Court deems just and proper.

## COUNT IV - ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (Employee Plaintiffs)

81.     Paragraphs 1- 80 are repeated and re-alleged as if fully stated herein.

82.     Under the IWPCA, Plaintiffs were entitled to be paid according to the terms of the agreed upon commission plan.

83.     By unilaterally changing the terms of the agreed upon commission plan, Defendant violated the IWPCA.

84.     Defendant also violated the IWPCA by making unauthorized deductions from Plaintiffs' compensation.

WHEREFORE, Plaintiffs pray for a judgment against Defendant as follows:

A.     Judgment in the amount of unpaid commissions;

B.      Statutory damages and penalties pursuant to the formula set forth in 820 ILCS 115/14.

C.     That the Court declares that Defendants have violated the IWPCA;

D.     That the Court enjoins Defendants from further violating the IWPCA;

E.     Reasonable attorneys' fees and costs of this action, as provided by the IWPCA; and

F.     All further relief as this Court deems just and proper.

## COUNT V – ILLINOIS ONE DAY REST IN SEVEN ACT
### (Employee Plaintiffs)

85.     Paragraphs 1- 84 are repeated and re-alleged as if fully stated herein.

86.     Under the IODRSA, employers are required to provide employees who work for 7.5 continuous hours or longer at least 20 minutes for a meal period beginning no later than 5 hours after the start of the work period. 820 ICLS 140/3.

87.     By failing to provide Plaintiffs with the requisite meal period, Defendant violated the IODRSA.

WHEREFORE, Plaintiffs pray for a judgment against Defendant as follows:

A.      That the Court declare that Defendant violated the IODRSA;

B.      That the Court award all compensatory damages recoverable under the IODRSA;

C.      That the Court award treble damages available under the IODRSA;

D.      Reasonable attorneys' fees and costs of this action, as provided by the IODRSA; and

E.      All further relief as this Court deems just and proper.

Respectfully submitted,

TYSON BEAUCHAMP and TREVOR SCOTT

_____s/Kerry E. Saltzman_____

SIGNAL FUNDING, LLC

_____s/Jeffrey A. Leon_____
                Signal Funding, LLC

Kerry E. Saltzman                       Jeffrey A. Leon
Aaron W. Chaet                          Grant Lee
WILLIAMS, BAX & SALTZMAN, P.C.          QUANTUM LEGAL LLC
221 N. LaSalle St., Ste. 3700           513 Central Avenue, Suite 300
Chicago, IL 60601                       Highland Park, IL 60035
(312) 372-3311                          T: (847) 433-4500
saltzman@wbs-law.com                    F: (847) 433-2500
chaet@wbs-law.com                       jeff@qulegal.com

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies that the undersigned verily believes the same to be true.

10-17-16

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies that the undersigned verily believes the same to be true.

10/17/16